IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| M2M SOLUTIONS, LLC, and BLACKBIRD TECH LLC<br><br>Plaintiffs,<br><br>v.<br><br>SIERRA WIRELESS AMERICA, INC., and SIERRA WIRELESS, INC.,<br><br>Defendants. | Civil Action No. 14-cv-01102-RGA |
| M2M SOLUTIONS, LLC, and BLACKBIRD TECH LLC<br><br>Plaintiffs,<br><br>v.<br><br>TELIT COMMUNICATIONS PLC, and TELIT WIRELESS SOLUTIONS INC.<br><br>Defendants. | Civil Action No. 14-cv-01103-RGA |

MEMORANDUM OPINION

Stamatios Stamoulis, Richard C. Weinblatt, STAMOULIS & WEINBLATT LLC, Wilmington, DE; Attorneys for Plaintiffs M2M Solutions LLC and Blackbird Tech LLC

Wendy Verlander, Jeffrey D. Ahdoot (argued), BLACKBIRD TECHNOLOGIES, Boston, MA; Attorneys for Plaintiff Blackbird Tech LLC

Thomas C. Grimm, Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Ronald F. Lopez, NIXON PEABODY LLP, San Francisco, CA; Jennifer Hayes (argued), NIXON PEABODY LLP, Los Angeles, CA; Attorneys for Defendants Sierra Wireless America, Inc. and Sierra Wireless, Inc.

Jack B. Blumenfeld, Rodger D. Smith II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; David Loewenstein (argued), Clyde A. Shuman, PEARL COHEN ZEDEK LATZER, New York, NY; Attorneys for Defendant Telit Wireless Solutions Inc.

November 26, 2019

**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court is the issue of claim construction of multiple terms in U.S. Patent No. 8,648,717 ("the '717 patent"). The Court has considered the Parties' Joint Claim Construction Brief. (D.I. 124).[1] The Court heard oral argument. (D.I. 128). The Court reviewed supplemental submissions. (D.I. 129, 132).

## I. BACKGROUND

Plaintiff M2M filed the instant actions on August 26, 2014, alleging infringement of the '717 patent by Defendants Sierra[2] and Telit.[3] (D.I. 1). Blackbird joined as a plaintiff on June 21, 2017. (D.I. 50). The '717 patent is in the same family as U.S. Patent Nos. 8,094,010 ("the '010 patent") and 7,583,197 ("the '197 patent"). M2M previously asserted that Defendants had infringed the '010 and '197 patents.[4] Like those patents, the '717 patent claims a programmable communicator device that can control the data transmitted between at least two devices. (D.I. 124 at 1, 4–5). Plaintiffs assert claims 25–28 and 30. (D.I. 124 at 5 n.10).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the

---
[1] All docket items citations refer to C.A. No. 14-1102 unless otherwise noted.
[2] C.A. No. 14-1102.
[3] C.A. No. 14-1103.
[4] C.A. No. 12-030; C.A. No. 12-033.

1

literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (internal quotation marks omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic

evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## III. CONSTRUCTION OF DISPUTED TERMS

1. "A programmable communicator device" (all asserted claims)

    a. *Plaintiffs' proposed construction*: the preamble is not a limitation

    b. *Defendants' proposed construction*: the preamble is a limitation. "A device that is programmable and is a communicator (i.e., that includes a complete wireless circuit that transmits and receives data and includes an antenna)"

    c. *Court's construction*: the preamble is limiting but does not need to be construed

Plaintiffs argue that the preamble is not limiting as it is "merely a descriptive name of the other claim limitations, rather than adding essential structure to the invention." (D.I. 124 at 6). Plaintiffs also argue that, even if the preamble were limiting, Defendants' proposed construction improperly adds a limitation that was "expressly removed" during prosecution in an "attempt to read a preferred embodiment into the claims." (*Id.* at 6–7).

Defendants counter that, because the inventors relied on the preamble during prosecution of the '717 patent to distinguish the prior art, the preamble should be limiting. (*Id.* at 8–9). Defendants also argue that the preamble in the '717 patent forms the antecedent basis for claim elements in the remainder of the claim and therefore is limiting. (*Id.* at 9–10). Defendants further argue that the preamble is limiting, because, without it, the body of the claims "do not define a structurally complete device." (*Id.* at 10). Defendants propose that the preamble should

3

be construed so that the claims cover devices that are programmable and include a wireless communication circuit and an antenna, because otherwise the claims would be structurally incomplete. (*Id.* at 10–11).

"Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (cleaned up). When a preamble phrase forms the "antecedent basis" for other terms in the body of the claim, the preamble "may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Id.* Similarly, the preamble is limiting where it is "essential to understand limitations or terms in the claim body." *Id.*

Here, the preamble is limiting because it both forms the antecedent basis for other claim terms in the body and is necessary to understanding other limitations. The preamble to independent claim 24 recites, "A programmable communicator device," and the remaining terms refer to "the programmable communicator device." '717 patent, col. 14:56–15:18. Likewise, dependent claims 25–26 each recite, "A programmable communicator device," and refer to "the programmable communicator device" in the remainder of the claim. '717 patent, col. 15:19–34. The preamble is also necessary to understanding other limitations in the claim body, because, without the preamble, the limitations would not be understood as functioning as part of a device.

The preamble, however, does not need to be construed. It is obvious from the context of the claims what is meant by a "programmable communicator device," and Defendants' proposed limitations are not required. Neither the patent specification nor the prosecution history require that the device be construed to "include[] a complete wireless circuit that transmits and receives

4

data and [to] include[] an antenna." Therefore, while the preamble is limiting, it need not be construed.

2.  "programmable interface" (all asserted claims)

"wherein the programmable interface is wirelessly programmable by an incoming short message service (SMS) data message, a GPRS message, or any wireless packet switched data message" (claim 27)

"wherein the programmable interface is programmable by wireless packet switched data messages" (claim 30)

    a.   *Plaintiffs' proposed construction*:
*"Programmable interface"*: "an interface that is able to be directly programmed"
*Claim 27*: "wherein the programmable interface is capable of being programmed in response to the content of a wireless packet switched data message received by the programmable communicator device"
*Claim 30*: "wherein the programmable interface is capable of being programmed in response to the content of an incoming short message service (SMS) data message, a GPRS message, or any wireless packet switched data message received by the programmable communicator device"

    b.   *Defendants' proposed construction*:
*"Programmable interface"*: "an interface that is able itself (i.e., independently of the processing module) to be programmed to perform a task or an operation"
*Claim 27*: "the interface itself is able to accept programming messages as incoming short message service (SMS) data messages, GPRS messages, or wireless packet switched data messages"
*Claim 30*: "the interface itself is able to accept programming messages as wireless packet switched data messages"

    c.   *Court's construction*: "an interface that is itself able to be programmed"

The parties agree that it is the programmable interface itself that is able to be programmed. (D.I. 124 at 19; D.I. 128 at 31:23–32:3). But the parties disagree as to whether a programming instruction can go through an intermediary before reaching the programmable interface or whether the programming instruction must go straight from its origin to the programmable interface. (*See* D.I. 124 at 21–24). Specifically, for claims 27 and 30, the dispute is whether the programmable interface receives a wireless programming instruction that is still in wireless form when received by the programmable interface. (*See id.* at 21, 23).

5

The intrinsic record of the '717 patent does not distinguish between programming commands that pass through an intermediary versus those that go straight to the interface. The intrinsic record also lacks any requirements that an instruction be in wireless (as opposed to hard-wired) form when the programming interface itself is programmed by the instruction. Presumably, a wireless instruction could be received by the programmable communicator device and transformed into a hard-wired instruction before it programs the programmable interface. (*See id.* at 23).

Defendants argue that Plaintiffs made an admission during *inter partes* review proceedings: "what is required . . . is that the programmable interface itself receives wireless messages." (D.I. 124 at 20; *see* D.I. 116, Ex. 21-9 at 62:17–20). Defendants contend that this statement, made only during oral argument and not in Plaintiffs' papers, is a disclaimer that the programmable interface itself must receive and be programmed by wireless messages in their wireless form. (D.I. 124 at 20). For a statement to be considered prosecution history disclaimer, a party's statement must be a clear and unmistakable disclaimer. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1363 (Fed. Cir. 2017). "[W]hen a prosecution argument is subject to more than one reasonable interpretation, it cannot rise to the level of a clear and unmistakable disclaimer." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1100 (Fed. Cir. 2013).

Plaintiffs' disputed statement was made during oral argument in IPR2015-01823. The statement was made in a back-and-forth between the Judge and M2M's counsel about the authentication function and processing module. (*See* D.I. 116, Ex. 21-9 at 59:21–63:2). The statement was not made in the context of questioning on the programmable interface. The statement also does not indicate that the wireless messages that are received by the programmable interface are wireless programming instructions in the form of a "short message

6

service (SMS) data message, a GPRS message, or any wireless packet switched data message." The lack of specificity of the statement and the fact that it is out of context mean that the statement is subject to more than one reasonable interpretation and is therefore not clear and unmistakable disclaimer. Thus, this statement does not rise to the level of prosecution history disclaimer.

There is nothing else in the intrinsic record that suggests that Defendants' proposed limitation, that the programmable interface must be programmed through instructions in their wireless form without passing through an intermediary, is necessary. Therefore, "programmable interface" will be construed as "an interface that is itself able to be programmed." This construction does not require that the programmable interface must be programmed by instructions in their wireless form.

3. "processing module" (all asserted claims)

   a. *Plaintiffs' proposed construction*: "components or units of a computer program"

   b. *Defendants' proposed construction*: the limitation is indefinite as a means plus function limitation under 35 U.S.C. § 112 ¶ 6

   c. *Court's construction*:
      Claims 24–27: "components or units of a computer program"
      Claims 28 and 30: indefinite under 35 U.S.C. § 112 ¶ 2

I previously construed "processing module" to mean "components or units of a computer program" and determined that 35 U.S.C. § 112 ¶ 6 did not apply. (12-cv-030 D.I. 92 at 12–13). I later confirmed this under *Williamson v. Citrix Online LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc). (12-cv-030 D.I. 215 at 5–9). Plaintiffs propose that I adopt the same construction here. (D.I. 124 at 27). Defendants counter that there is no corresponding structure to the function claimed in claims 24–30 or to the "additional function" in claims 28 and 30, and therefore the limitation is indefinite under § 112 ¶ 2. (*Id.*).

7

In *Williamson*, the Federal Circuit overruled prior precedent that required a "strong" presumption that a limitation without the word "means" is not subject to § 112 ¶ 6. *Williamson*, 792 F.3d at 1349. The presumption still applies as it did prior to *Lighting World*, but "without requiring any heightened evidentiary showing . . . ." *Id.*; *see Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). Thus, the presumption can be "overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349 (cleaned up).

For claims 24 through 27, I adopt my previous construction that "processing module" means "components or units of a computer program" and determine that the claims are definite. These claims recite the same sufficient "three-step" algorithmic structure as the claims in the '010 patent, namely that the processing module authenticates "one or more wireless transmissions . . . by determining if at least one transmission contains a coded number." '717 patent, col. 14:60–64, 16:6–10; (*see* 12-cv-030 D.I. 215 at 8).

Defendants, however, do overcome the presumption against § 112 ¶ 6 for claims 28 and 30. Defendants demonstrate that the claim term recites "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349. "Structure," with regard to computer-implemented inventions, most often takes the form of "an algorithm for performing the claimed function." *See id.* at 1352; *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298–99 (Fed. Cir. 2014). The algorithm must provide "some explanation of how the [claim term] performs the claimed function." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009).

Defendants demonstrate that claims 28 and 30 recite the functions of determining a "change in status" and determining whether something "otherwise indicates an alarm condition" but do not recite any structure for carrying out those functions. "Module" is a nonce word, *see Williamson*, 792 F.3d at 1350, and "processing" fails to provide sufficient structure to the term "processing module." (*See* 12-cv-030 D.I. 215 at 2, 7). The words immediately following "processing module" in claims 28 and 30 do not provide algorithmic structure as they do not describe how the processing module carries out the "change in status" or "alarm condition" determinations. *See Blackboard*, 574 F.3d at 1384. Therefore, § 112 ¶ 6 applies.

Plaintiffs argue that Defendant Sierra, through the Expert Report of Dr. Kevin J. Negus in the previous case, admits that data processing and alert indications within wireless data modules were well-known. (D.I. 124 at 38). Dr. Negus's report states: "Functions such as processing data received from monitored devices, determining thresholds, and sending alarm indications wirelessly to monitoring devices, wherein such functions are performed by a processing module, were well known to the POSITA at or before the time of M2M's alleged priority date." (D.I. 125, Ex. Z at ¶ 178). Plaintiffs contend that because "processing modules" were well-known to perform these claimed functions, a POSITA would understand "processing module" to have sufficient structure. "But the fact that one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed." *Williamson*, 792 F.3d at 1351.

When § 112 ¶ 6 applies, as it does for claims 28 and 30, I must first identify the claimed function and then identify the corresponding structure, if any, disclosed in the specification. *Id.* at 1351–52. Structure corresponds to the claimed function if the specification clearly links the two. *Id.* at 1352. The claimed functions of the "processing module" in claims 28 and 30 are

9

determining whether a "change in status" is indicated and determining whether "an alarm condition" has "otherwise [been] indicate[d]." '717 patent, col. 15:40–44, 16:39–43.

The '717 specification does not disclose any corresponding structure for carrying out the claimed functions. The specification discusses "status condition" monitoring messages, *see* '717 patent, col. 7:58–61, 11:33–37, but does not disclose any structure associated with the function. Similarly, while the specification describes several instances of an "alarm means," *see* '717 patent, col. 4:54–59, 6:25–29, 7:48–50, 8:56–9:2, none of these references disclose more than a "black box" for performing the functions and do not disclose sufficient structure. The '717 patent fails to disclose any corresponding structure to the "change in status" or "alarm condition" functions of claims 28 and 30. Claims 28 and 30 are therefore invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. This determination also resolves the dispute over the "wherein the processing module . . ." clause recited in those two claims. (*See* D.I. 124 at 76–78).

Defendants contend that, under *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012), if I determine that claims 28 and 30 are invalid for lack of structure, claims 24–27 must be likewise invalid because they also claim a "processing module." (D.I. 128 at 59:4–20). *Noah*, however, is distinguishable. In that case the Federal Circuit determined that "where a disclosed algorithm supports some, but not all, of the functions associated with a means-plus-function limitation, we treat the specification as if no algorithm has been disclosed at all." *Noah*, 675 F.3d at 1318. This rule does not apply to the instant situation, however, because claims 24–27 recite sufficient algorithmic structure and do not depend on the specification for that algorithmic structure. Thus, by invalidating claims 28 and 30, I do not also invalidate claims 24–27.

4. "coded number" (all asserted claims)

   a. *Plaintiffs' proposed construction*: "a designated, unique sequence of characters"

   b. *Defendants' proposed construction*: "a unique sequence of characters designated to be different for every programmable communicator"

   c. *Court's construction*: "a designated, unique sequence of characters"

I previously construed "coded number" to mean "a designated, unique sequence of characters." (12-cv-030 D.I. 92 at 9). I construed "coded number" in this way because an object of the invention is to use a "coded number" to determine authenticity of a transmitted message. (*Id.*; *see* '010 patent, col. 4:35–40). The specification of the '010 patent makes frequent references to a PUK code, a unique code that is used for authentication. (*Id.*; *see, e.g.*, '010 patent, col. 9:41–49, 9:61–67). The same reasoning holds true for the '717 patent. *See* '717 patent, col. 4:45–50, 9:52–60, 10:5–11.

The parties, however, dispute the meaning of "unique" in this construction. (*See* D.I. 124 at 47). In light of the specification, "unique" must mean that a "coded number" is the only one with a certain value. No two "coded numbers" can have the same value. The specification offers a PUK code as an example of a "coded number," and then states that "any similar unique coding" may be used in the alternative. '717 patent, col. 9:43–45. Thus, the specification teaches that the code must be unique, and must be unique in a way similar to the way a PUK code is unique. A PUK code is unique in that it is different for every SIM card. '717 patent, col. 9:39–43. Thus, a "coded number" must be unique in the sense that no "coded number" can be the same as any other. Therefore, I again construe "coded number" to mean "a designated, unique sequence of characters."

11

5. "[the one or more wireless transmissions from the programming transmitter containing instructions to program the stored number comprise] one or more short message service (SMS) data messages" (claim 30)

    a. *Plaintiffs' proposed construction*: no construction required, plain and ordinary meaning

    b. *Defendants' proposed construction*: "one SMS data message" is a single wireless transmission

    c. *Court's construction*: no construction required, plain and ordinary meaning

Defendants argue that a single data message is a single transmission, which contains both the coded number and telephone number or IP address. (D.I. 124 at 51). Plaintiffs counter that the plain meaning of the claim language is that a single wireless transmission can consist of one or more SMS data messages. (*Id.* at 48). I agree with Plaintiffs. There is nothing in the intrinsic record that requires that a single transmission cannot have more than one data message in it. Furthermore, the parties' agreed upon construction for "at least one of the transmissions including the at least one telephone number or IP address and the coded number" is "a single wireless transmission that includes both the coded number and the telephone number or IP address." (*Id.* at 78). This agreed upon construction also does not require that a single transmission is a single message. Therefore, no construction is required, and the claim is understood by its plain and ordinary meaning.

The plain meaning construction resolves Defendants' contention that Plaintiffs "undermine" the agreed upon construction for the term "at least one of the transmissions including the at least one telephone number or IP address in the coded number." (*Id.*). Because a single transmission can contain one or more SMS data messages, as Plaintiffs contend, Plaintiffs do not "undermine" the agreed upon construction.

12

6. "numbers to which the programmable communicator device is configured to and permitted to send outgoing wireless transmissions" (all asserted claims)

    a. *Plaintiffs' proposed construction*: "the set of numbers to which the programmable communicator is limited to sending one or more types of outgoing wireless transmissions"
*Plaintiffs' modified proposed construction*: "the exclusive set of numbers to which the programmable communicator is limited to sending a particular type of outgoing wireless transmissions"

    b. *Defendants' proposed construction*: "the exclusive set of numbers to which the programmable communicator is limited to send any outgoing wireless transmissions"
*Defendants' modified proposed construction*: "the exclusive set of numbers to which the programmable communicator is limited to send any outgoing wireless transmissions, excluding automated system administration transmissions, such as, for maintenance, routing, or location detection"

    c. *Court's construction*: "the exclusive set of numbers to which the programmable communicator is limited to send any outgoing wireless transmissions"

Plaintiffs' modified proposed construction agrees with Defendants' proposed constructions that the "set of numbers" is "exclusive." The dispute remains as to whether the "exclusive set of numbers" is limited to a particular type of transmission. (D.I. 132 at 3). Plaintiffs argue that the list may restrict outbound transmissions of one type (e.g., telephone calls) to the numbers on the list, but this would not restrict outbound transmissions of another type (e.g., wireless data messages). (D.I. 124 at 65). Defendants argue that there is no support in the patent for the "type" limitation and instead that the specification supports the construction that all outbound transmissions must have numbers that are authenticated and on the list. (D.I. 124 at 61–63).

I agree with Defendants. The patent does not support the construction that "the exclusive set of numbers to which the programmable communicator is limited to" sending outgoing wireless transmissions only limits a "particular type" of transmission but does not limit transmissions of a different type. The point of the invention in the mobile phone context, as set

13

out in the specification, is to create a restricted-use mobile phone for a child to prevent "uncontrolled calling." '717 patent, col. 2:24–32. In the context of a communications tag embedded in clothing, the patent describes the device configured to alert a central point when the wearer is in need of rescue. *Id.* at col. 3:41–51. In the appliance monitoring context, the specification discusses the device sending information about the status of a vending machine or whether a door is open or closed. *Id.* at col. 2:6–8. These uses of the patented invention involve limited and quick communications. These uses do not suggest that broader communication options, let alone the ability to dial a number or connect to an IP address not already programmed into the device, are contemplated by the patent.

Furthermore, the specification describes that, when the device makes a call to a first linked telephone or IP address that does not answer or connect, the device "has the means to select any other telephone number or IP address in the permitted callers list such that it can be connected to said other telephone or IP device." *Id.* at col. 5: 47–54. This suggests that the permitted callers list may contain both telephone numbers and IP addresses, and that outgoing wireless transmissions are limited to those telephone numbers and/or IP addresses on the list.

Therefore, I construe "numbers to which the programmable communicator device is configured to and permitted to send outgoing wireless transmissions" to mean "the exclusive set of numbers to which the programmable communicator is limited to send any outgoing wireless transmissions."

Plaintiffs stated at oral argument that Defendants' original proposed construction would preclude the device from sending out automatic system transmissions. (*See* D.I. 128 at 95:18–25). Defendants responded that they did not read the patent to address limiting automatic system transmissions. (*Id.* at 97:21–98:1). I agree with Defendants that the patent does not contemplate

14

automatic system transmissions and thus it is unnecessary to include a specific exception for these transmissions in the construction. The Court's construction therefore does not limit automatic system transmissions.

7. "an identity module" (all asserted claims)
    a. *Plaintiffs' proposed construction*: "a memory location for storing a unique identifier of the programmable communicator device." This is not means-plus-function.
    b. *Defendants' proposed construction*: This is means-plus-function. Function: "storing a unique identifier that is unique to the programable communicator device." Structure: a SIM card.
    c. *Court's construction*: "a memory location for storing a unique identifier of the programmable communicator device"

Defendants argue that "an identity module" is a means-plus-function claim term. (D.I. 124 at 70–71). While "module" may be a nonce word, Defendants still must overcome the presumption that § 112 ¶ 6 does not apply. *See Williamson*, 792 F.3d at 1350. Defendants have not "demonstrated that the claim term fails to recite sufficiently definite structure." *Id.* at 1349 (cleaned up). Instead, Plaintiffs have shown that "an 'identity module' for storing a unique identifier was a well-known component in wireless devices at least as early as February 2000." (D.I. 132 at 4).

The Wireless Application Protocol (WAP) Identity Module Specification (Version 18-Feb-2000) defined an "industry-wide specification for developing applications that operate over wireless communications networks." (*Id.*, Ex. A at 6). The Specification describes a WAP Identity Module that is used to "store and process information needed for user identification and authentication." (*Id.*). The Specification defines a WAP Identity Module: "A tamper-resistant device which is used in performing . . . [Wireless Transport Layer Security] and application level

15

security functions, and especially, to store and process information needed for user identification and authentication." (*Id.* at 10). The Specification gives as an example of a WAP Identity Module implementation a Subscriber Identity Module (SIM) card or an external smart card. (*Id.* at 6). Thus, the Specification demonstrates that "an identity module" for "storing a unique identifier" was a well-known component in wireless devices used to "store and process information needed for user identification and authentication" at least as early as February 2000.

One of ordinary skill in the art would therefore understand "identity module" to have sufficient structure. The presumption is not overcome and § 112 ¶ 6 does not apply. Thus, I construe "an identity module" to mean "a memory location for storing a unique identifier of the programmable communicator device."

8. "unique identifier" (all asserted claims)
   a. *Plaintiffs' proposed construction*: "a coded number that serves as an identifier of a particular programmable communicator device"
   b. *Defendants' proposed construction*: "unique sequence of characters designated to be different for every programmable communicator" and "that serves as an identifier of a particular programmable communicator device"
   c. *Court's construction*: "a unique sequence of characters different for every programmable communicator that serves as an identifier of a particular programmable communicator device"

The parties agreed that a "unique identifier" means "a unique sequence of characters different for every programmable communicator that serves as an identifier of a particular programmable communicator device." (D.I. 128 at 109:25–110:12).

## IV. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion suitable for submission to the jury.

16