IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

M2M SOLUTIONS LLC and              )
BLACKBIRD TECH LLC d/b/a           )
BLACKBIRD TECHNOLOGIES,            )
                                   )
        Plaintiffs,                )
                                   )
        v.                         )        Civil Action No. 14-1102-RGA
                                   )
SIERRA WIRELESS AMERICA, INC.      )        ███████████
and SIERRA WIRELESS INC.,          )
                                   )
        Defendants.                )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this patent infringement action is the motion for summary judgment filed by defendants Sierra Wireless America, Inc. and Sierra Wireless Inc. (collectively, "Defendants").[1]  (D.I. 165)  For the following reasons, I recommend that the court GRANT Defendants' motion for summary judgment of non-infringement under the doctrine of equivalents, GRANT the motion with respect to the "exclusive set of numbers" limitation, and DENY the motion for summary judgment in all other respects.  I further recommend that the court DENY Defendants' *Daubert* motion to exclude Mr. Wacek's expert testimony and GRANT Defendants' *Daubert* motion to exclude Mr. Geier's expert testimony with respect to the "exclusive set of numbers" limitation.

---

[1] The briefing and related filings associated with Defendants' motion for summary judgment are found at D.I. 166, D.I. 167, D.I. 177, D.I. 178, D.I. 187, D.I. 188, D.I. 195, and D.I. 196.

## II.    BACKGROUND[2]

### A.  Procedural History

Plaintiff M2M Solutions LLC ("M2M") filed this patent infringement action on August

26, 2014, alleging that Defendants infringe United States Patent No. 8,648,717 ("the '717

patent"), entitled "Programmable Communicator."  (D.I. 1)  The '717 patent claims a

programmable communicator device that can control data transmitted between at least two

devices.  ('717 patent; D.I. 140 at 1)  Plaintiff Blackbird Tech LLC ("Blackbird;" together with

M2M, "Plaintiffs") joined the action on June 21, 2017 following M2M's assignment of its rights

to the '717 patent to Blackbird.  (D.I. 50; D.I. 103 at ¶ 9)  Plaintiffs filed an amended complaint

on April 26, 2019.  (D.I. 103)  On November 26, 2019, the court issued a Memorandum Opinion

construing the disputed claim terms in the '717 patent and finding claims 28 and 30 invalid for

indefiniteness under 35 U.S.C. § 112, ¶ 2.  (D.I. 140 at 10)

### B.  IPR Proceedings

The '717 patent has been the subject of numerous petitions for *inter partes* review

("IPR") filed with the Patent Trial and Appeal Board ("PTAB") beginning in August 2015.  (D.I.

37)  The PTAB declined to institute proceedings on several IPR petitions,[3] but granted institution

on petitions filed by Defendants in IPR2015-01823 (the "Sierra IPR") and by Telit Wireless

Solutions Inc. and Telit Communications PLC (collectively, "Telit") in IPR2016-00055 (the

"Telit IPR").  As set forth below, the ensuing final written decisions rendered all but claims 25-

28 and 30 of the '717 patent invalid.  (D.I. 167, Exs. B & C)

---

[2] Relevant facts pertaining to discrete issues raised in the parties' briefing are set forth in the court's analysis of the applicable issue.

[3] Details of other IPR petitions that were denied institution can be found in the periodic status reports filed by the parties regarding the status of IPR proceedings relating to the '717 patent. (D.I. 37; D.I. 39; D.I. 42; D.I. 43; D.I. 45; D.I. 47)

Defendants submitted an IPR petition on August 26, 2015 regarding claims 1-3, 5-7, 10-24, and 29-30 ("IPR2015-01823" or the "Sierra IPR").  (D.I. 178, Ex. 5 at 2)  The PTAB issued its institution decision on March 8, 2016, instituting IPR proceedings on claims 1, 3, 5, 6, 10-13, 15-24, and 29 of the '717 patent, but denied institution with respect to claims 2, 7, 14, and 30.  (*Id.*; *see also* D.I. 37)  On March 6, 2017, the PTAB issued its final written decision in the Sierra IPR, concluding that claims 24 and 29 were unpatentable as obvious under 35 U.S.C. § 103 based on the combination of Whitley and the SIM Specification.  (D.I. 178, Ex. 5 at 21-57)  The PTAB did not invalidate the balance of patent claims at issue in the Sierra IPR.  (*Id.* at 57-62)

On October 21, 2015, Telit filed two IPR petitions directed to the '717 patent.  (D.I. 40)  On April 22, 2016, the PTAB entered a decision granting institution in IPR2016-00055 (the "Telit IPR") on all but claims 25-28 and 30 of the '717 patent.  (D.I. 41; D.I. 178, Ex. 10)  In denying institution on claims 25-27, the PTAB determined that Telit did "not sufficiently identif[y] and explain[] the bases for its asserted ground as to claims 25-27."  (D.I. 178, Ex. 10 at 20, 22)  Telit promptly submitted a partial request for rehearing of the PTAB's decision not to institute IPR proceedings for claims 25, 27, 28, and 30.  (D.I. 178, Ex. 11 at 2)  Telit did not challenge the PTAB's decision not to institute proceedings regarding claim 26.  (*Id.*)  The PTAB denied the request for rehearing.  (*Id.*)

The PTAB issued its final written decision in the Telit IPR on March 6, 2017, invalidating claims 1-23 and 29 of the '717 patent as obvious under 35 U.S.C. § 103.  (D.I. 47; D.I. 167, Ex. B)  However, the PTAB determined that Telit failed to prove by a preponderance of the evidence that claim 24 was unpatentable as anticipated by Van Bergen under 35 U.S.C. § 102.  (D.I. 167, Ex. B at 62-63)

3

Following the PTAB's March 2017 final written decisions in the Sierra IPR and the Telit

IPR, the only surviving patent claims in the '717 patent were claims 25-28 and 30.

### C. Asserted Claims

Dependent claims 25 to 27 (the "Asserted Claims") are the only surviving claims of the

'717 patent following the PTAB's final written decisions invalidating claims 1-24 and 29 and the

court's claim construction decision invalidating claims 28 to 30.  *See* § II.A & B, *supra*.  The

Asserted Claims depend on independent claim 24, which recites:

> A programmable communicator device comprising:
> a programmable interface for establishing a communication link with at least one
>     monitored technical device; and
> a processing module for authenticating one or more wireless transmissions sent
>     from a programming transmitter and received by the programmable
>     communicator device by determining if at least one transmission contains
>     a coded number;
> wherein the programmable communicator device is configured to use a memory
>     to store at least one telephone number or IP address included within at
>     least one of the transmissions as one or more stored telephone numbers or
>     IP addresses if the processing module authenticates the at least one of the
>     transmissions including the at least one telephone number or IP address
>     and the coded number by determining that the at least one of the
>     transmissions includes the coded number, the one or more stored
>     telephone numbers or IP addresses being numbers to which the
>     programmable communicator device is configured to and permitted to
>     send outgoing wireless transmissions;
> wherein the programmable communicator device is configured to use an identity
>     module for storing a unique identifier that is unique to the programmable
>     communicator device; and
> wherein the programmable communicator device is configured to process data
>     received through the programmable interface from the at least one
>     monitored technical device.

('717 patent, cols. 14:56-15:18)  Claim 25 adds that the programmable communicator

device must be "configured to process data received through the programmable interface

from the at least one monitored technical device in response to programming instructions

received in at least one incoming short message service (SMS) data message, a GPRS

message, or any wireless packet switched data message." (*Id.*, col. 15:19-26)  Claim 26, which depends from claim 25, further requires that the device must be configured to request that the monitored technical device send data through the programmable interface for receipt by the programmable communicator device in response to programming instructions received in the incoming data message. (*Id.*, col. 15:19-34)  Claim 27 requires the programmable interface to be wirelessly programmable by the incoming data message. (*Id.*, col. 15:35-39)

### D.  Accused Products

Plaintiffs accuse Defendants' AirPrime and AirLink programmable communicator products (the "Accused Products") of infringing claims 25 to 27 of the '717 patent.  Plaintiffs' expert, Mr. James Geier, categorizes the Accused Products into three groups: (1) AirPrime modules without ReadyAgent ("Group 1" products), such as the AR7552; (2) AirPrime modules with ReadyAgent ("Group 2" products), such as the SL8080; and (3) AirLink routers and gateways, such as the GX450.  (D.I. 178, Ex. 2 at ¶ 50)  The representative nature of the AR7552 and SL8080 products is undisputed.  (*Id.*, Ex. 3 at ¶ 47)  The Accused Products have a SIM interface and are capable of being used with a SIM card.  (*Id.* at ¶ 59)  Some of the Accused Products are sold with the option of an embedded SIM card.  (*Id.* at ¶¶ 57, 60, 203)

## III.   MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  An assertion that a fact cannot

be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that the party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating that entry of summary judgment is mandated "against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## A. Whether Collateral Estoppel Applies to Claims 25 to 27 Based on the PTAB's Obviousness Determination Invalidating Other Claims

"Issue preclusion serves to 'preclude parties from contesting matters that they have had a full and fair opportunity to litigate,' which 'protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1382 (Fed. Cir. 2018) (quoting *Mont. v. United States*, 440 U.S. 147, 153–54 (1979)). In accordance with these principles, the Third Circuit assesses four requirements in applying the doctrine of issue preclusion: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Orexo AB v. Actavis Elizabeth LLC*, 371 F. Supp. 3d 175, 182 (D. Del. 2019) (quoting *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (internal quotation marks and citation omitted)). After determining the procedural applicability of issue preclusion under Third Circuit law, the court must apply Federal Circuit precedent to questions involving substantive issues of patent law. *See Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (citing *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013)).

The parties' dispute in this case focuses on whether the invalidity determination in the IPR proceedings regarding claims 1, 12, 24, and 29 of the '717 patent may be extended to invalidate claims 25 to 27 of the '717 patent.  The parties do not dispute the fact that the PTAB invalidated claims 1, 12, 24, and 29 of the '717 patent during the IPR proceedings, and the PTAB's ruling has a preclusive effect with respect to claims 1, 12, 24, and 29 in the instant litigation.  (D.I. 177 at 5; D.I. 187 at 2-3)  In *B&B Hardware, Inc. v. Hargis Industries, Inc.*, the Supreme Court held that a final decision in an agency proceeding may preclude issues raised in a subsequent court proceeding.  *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015) ("[I]ssue preclusion is not limited to those situations in which the same issue is before two *courts*. Rather, where a single issue is before a court and an administrative agency, preclusion also often applies.").  The Federal Circuit confirmed that this general principle of issue preclusion extends to final written decisions rendered by the PTAB in IPR proceedings. *See Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1250-1251 (Fed. Cir. 2019) ("[T]he issue preclusion doctrine can apply in this court to the Patent Trial and Appeal Board's decision in an IPR once it becomes final.").

Defendants argue that the preclusive effect of the PTAB's IPR ruling on claims 1, 12, 24, and 29 should also extend to claims 25 to 27, which were not the subject of a final written decision by the PTAB.[4]  According to Defendants, collateral estoppel should apply because there

---

[4] The record before the court establishes that Defendants did not seek institution on claims 25 to 27 in the Sierra IPR.  (D.I. 167, Ex. C; D.I. 178, Ex. 4 at 2)  In the Telit IPR, the PTAB carved out claims 25 to 27 from its decision instituting IPR proceedings on other asserted claims of the '717 patent because Telit "provide[d] only cursory references to other claims with no substantive analysis" of the limitations unique to claims 25 to 27.  (D.I. 178, Ex. 10 at 19)  Because "[t]he language of the claims is different, and [Telit] has not sufficiently identified and explained the bases for its asserted ground as to claims 25–27," the PTAB concluded that Telit failed to satisfy the requirements of 37 C.F.R. §§ 42.104(b) and 42.22(a)(2).  (*Id.*, Ex. 10 at 20)  The PTAB did not substantively address any differences between claims 25 to 27 and the remaining claims of

are no material differences between claims 25 to 27 of the '717 patent and claims 1, 12, 24, and 29.  (D.I. 166 at 2-5, 10-11)  Defendants rely on Federal Circuit precedent holding that collateral estoppel may extend to unadjudicated patent claims when there are no material differences between the unadjudicated and adjudicated claims.  *See Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1319 (Fed. Cir. 2015) ("Complete identity of claims is not required to satisfy the identity-of-issues requirement for claim preclusion."); *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) ("If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies.").

Plaintiffs argue that there can be no identity of issues where, as here, different burdens of proof apply in each tribunal.  (D.I. 177 at 4-6)  In particular, Plaintiffs focus on the claim term "process data," which was construed by the PTAB in the Sierra IPR under the broadest reasonable interpretation ("BRI") standard and was not construed in this court during claim construction.  (*Id.* at 7-8)  Plaintiffs contend that the term should therefore be given its plain and ordinary meaning in this litigation, but they argue that a dispute between the parties' experts regarding the plain and ordinary meaning of the term raises a genuine issue of material fact sufficient to defeat summary judgment.  (*Id.* at 8-9)

I recommend that the court deny Defendants' motion for summary judgment on the asserted basis of collateral estoppel.  The PTAB rendered its final written decisions in the Sierra and Telit IPRs prior to two critical developments in patent law.  First, the PTAB must now issue

---

the '717 patent.  (*Id.*)  The PTAB's institution decision in the Telit IPR was rendered two years before the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, which mandated that the PTAB must address every claim challenged by the petitioner in the final written decision.  138 S. Ct. 1348, 1354 (2018).

a final written decision on every patent claim challenged in an IPR petition. *See SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018). Accordingly, the PTAB's nondiscretionary obligation to substantively evaluate all challenged claims in an IPR petition now prevents circumstances like those presented here, in which several dependent claims survived without undergoing substantive analysis while the majority of the patent claims were invalidated. Second, the PTAB now applies the same "plain and ordinary meaning" standard that is used in federal courts:

> In an inter partes review proceeding, a claim of a patent . . . shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

37 C.F.R. § 42.100(b). This change in the law was intended to eliminate issues stemming from the application of different claim construction standards in each tribunal. But at the time of the Sierra and Telit IPRs, the BRI standard still applied to PTAB proceedings. In this regard, the final written decisions in the Sierra and Telit IPRs issued at a time when it was wholly possible for a few dependent claims to survive the IPR proceedings without substantive evaluation and to then undergo an invalidity analysis in federal court under a different claim construction standard.

The different claim construction standards applied by the PTAB and the federal courts prevent any expansion of the collateral estoppel doctrine here. *See SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016) ("Because the Board applies the broadest reasonable construction of the claims while the district courts apply a different standard of claim construction as explored in *Phillips* . . ., the issue of claim construction under *Phillips* to be determined by the district court has not been actually litigated."); *see also TQ Delta, LLC v. Zyxel Commc'ns, Inc.*, C.A. No. 13-2013-RGA et al., 2018 WL 3135843, at *8 (D. Del. June 27, 2018). In the Sierra IPR, the PTAB applied the broadest reasonable interpretation ("BRI")

standard to construe the term "process data."[5]  Under this standard, the PTAB concluded that the term "process data" was not limited to intelligent determinations, but also extended to routine low-level tasks such as formatting or packetizing data for transmission over a wireless network. (D.I. 167, Ex. C at 16-18)

In this litigation, the term "process data" must be given its plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention because the parties did not seek construction of the term during claim construction.  *See Belden Techs. Inc. v. Superior Essex Commc'ns LP*, 733 F. Supp. 2d 517, 545 (D. Del. 2010) (quoting *Phillips*, 415 F.3d at 1313). Defendants' expert proffered an opinion that the plain and ordinary meaning of the term "process data" is consistent with the PTAB's construction in the Sierra IPR, and it should be understood to include low-level tasks.  (D.I. 177, Ex. 6 at ¶¶ 11-27)  In contrast, Plaintiffs' expert has opined that the plain and ordinary meaning of "process data" is limited to devices capable of intelligent determination-type data processing, and it does not include low-level tasks.  (D.I. 178, Ex. 1 at ¶¶ 16-18)  The dispute between the parties' experts regarding the plain and ordinary meaning of the term "process data" raises a factual issue to be resolved by the jury.  "That the parties' experts do not agree on the plain and ordinary meaning of the term presents a genuine issue of material fact not properly resolved on summary judgment."  *Cradle IP, LLC v. Texas Instruments, Inc.*, 5 F. Supp. 3d 626, 650 (D. Del. 2013).  The dispute is material because the

---

[5] Defendants argue that, regardless, issue preclusion should apply based on the Telit IPR because the PTAB did not construe the term "process data" in that proceeding.  (D.I. 187 at 7)  But this ignores the fact that "issue preclusion requires that 'the issues were actually litigated.'" *SkyHawke*, 828 F.3d at 1376 (quoting *In re Trans Tex. Holding Corp.*, 498 F.3d 1290, 1297 (Fed. Cir. 2007)).  Because the PTAB did not construe the term "process data" at all, it cannot be said that the issue of the term's plain and ordinary meaning was actually litigated.

issue of whether low-level tasks fall within the scope of the term "process data" may affect whether Defendants' prior art references read on the Asserted Claims of the '717 patent.

Defendants argue that collateral estoppel should nonetheless apply based on two lines of Federal Circuit precedent.  In *Papst Licensing*, the Federal Circuit held that a ruling by the PTAB invalidating a patent claim has collateral estoppel effect on the validity of that same claim in a court proceeding.  *See Papst Licensing*, 924 F.3d at 1250-1251.  Moreover, the Federal Circuit has held that a decision by a court invalidating one patent claim may collaterally estop the litigant from asserting the validity of materially similar, unadjudicated claims in litigation.  *See See Soverain Software*, 778 F.3d at 1319; *Ohio Willow Wood*, 735 F.3d at 1342.  Here, Defendants ask the court to bridge these two lines of cases and hold that the PTAB's IPR decisions invalidating certain claims of the '717 patent should collaterally estop Plaintiffs from asserting the validity of the unadjudicated Asserted Claims.

The Federal Circuit has not expressly extended the holdings of *Soverain Software* and *Papst Licensing* to address whether PTAB decisions invalidating patent claims have a preclusive effect in district court on unadjudicated, but materially similar, patent claims.[6]  *See Papst v. Samsung*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) ("The Federal Circuit does not appear to have directly ruled on the specific circumstances in this case.").  There is no consensus among district courts regarding whether PTAB decisions have a preclusive effect in litigation on unadjudicated claims.  *Compare Intellectual Ventures I, LLC v. Lenovo Grp. Ltd.*, 370 F. Supp. 3d at 257 (D. Mass. 2019) *with Papst v. Samsung*, 403 F. Supp. 3d at 602-603.  Under the

---

[6] In *Soverain Software* and *Ohio Willow Wood*, both the invalidated claims and the unadjudicated claims were litigated in court, and the Federal Circuit did not have occasion to consider whether an agency determination of invalidity by the PTAB could have a preclusive effect on unadjudicated claims asserted in a subsequent litigation in court.  *See Soverain Software*, 778 F.3d at 1319; *Ohio Willow Wood*, 735 F.3d at 1342-43.

circumstances presented in this case, I recommend that the court decline to extend the doctrine of collateral estoppel to reach the unadjudicated Asserted Claims.

The cases relied upon by Defendants articulate an underlying policy suggesting that collateral estoppel should be applied to uphold the finality of PTAB decisions. In *XY*, for instance, the Federal Circuit held that "an affirmance of an invalidity finding, whether from a district court or the Board, has a collateral estoppel effect on all pending or co-pending actions" because the patentee "has had is day in court, and a defendant should not have to continue defending a suit for infringement of an adjudged invalid patent." *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018); *see also Intellectual Ventures*, 370 F. Supp. 3d at 256; *Cisco Sys.*, 2020 WL 4923697, at *4-5 (concluding that "preclusive effect must be given to the PTAB's decision on invalidity despite differences in the standard of claim construction or validity," and the PTAB's invalidity finding is "entitled to particular deference, because there is a strong interest in finality.") (citing 37 C.F.R. § 42.73(d)(3)). But this policy of finality is not advanced where, as here, there is no question that the claims invalidated by the PTAB in the Sierra and Telit IPRs remain invalid. In this case, the jury may evaluate the validity of the Asserted Claims without disturbing the PTAB's final written decisions in the IPR proceedings because the PTAB did not previously consider the Asserted Claims.

### B. Whether Defendants' Alternative Theory of Collateral Estoppel Applies

I recommend that the court deny Defendants' alternative collateral estoppel argument with respect to the PTAB's findings regarding the disclosure of the prior art and motivation to combine. Defendants' own authority does not support its argument that collateral estoppel applies to this issue. (D.I. 166 at 15-16) In *Clearlamp, LLC v. LKQ Corp.*, the court found the PTAB's decision in IPR proceedings persuasive but, as Defendants themselves acknowledge, the

court declined to apply collateral estoppel.  (*Id.* at 16); *Clearlamp*, 2016 WL 4734389, at *6 (N.D. Ill. Mar. 18, 2016).  Instead, the court stated that it independently assessed the prior art and acknowledged that "[t]he different standards of review, the different evidence presented, and the different arguments made, raise the possibility of inconsistent unpatentability and invalidity decisions, but this type of inconsistency is permitted by the patent laws."  *Id.* at *6 ("This is not a decision that this court reaches by merely adopting the PTAB's decision but, as explained below, is one that this court reaches only after considering the prior art that is before it on summary judgment.[8] While there is certainly some overlap between the PTAB's and this court's review, given the different standards employed in *inter partes* and district court review, some repeated effort seems inevitable.").

### C.  Law of the Case Doctrine

In their reply brief, Defendants withdrew their motion for summary judgment under the law of the case doctrine.  (D.I. 187 at 11)  Therefore, the court need not reach this issue.

### D.  Patent Eligibility Under Section 101

The court next turns to the parties' dispute regarding whether claims 25 to 27 of the '717 patent are directed to ineligible subject matter under 35 U.S.C. § 101.  For the following reasons, I recommend that the court deny Defendants' motion for summary judgment on this issue.

#### 1.  Legal standard

Section 101 of the Patent Act provides that patentable subject matter extends to four broad categories: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  The Supreme Court recognizes three exceptions to the subject matter eligibility requirements of

§ 101: laws of nature, physical phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014). The purpose of these exceptions is to protect the "basic tools of scientific and technological work," *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012), which are "part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to none," *Bilski*, 561 U.S. at 602 (internal quotation marks and citations omitted).

The Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217; *see also Mayo*, 566 U.S. at 77-78. At step one, the court must determine whether the claims are directed to one of the three patent-ineligible concepts. *Alice*, 573 U.S. at 217. If the claims are not directed to a patent-ineligible concept, "the claims satisfy § 101 and [the court] need not proceed to the second step." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018). If the claims are directed to a patent-ineligible concept, the court must proceed to the second step by identifying an "'inventive concept'—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 218-19 (quoting *Mayo*, 566 U.S. at 72-73).

At step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."). However, "courts must

be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (internal quotation marks omitted). "At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; [courts] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).

At step two, the court must "look to both the claim as a whole and the individual claim elements" to determine whether they "amount[ ] to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312. "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 573 U.S. at 222 (internal quotation marks omitted). Instead, the claim elements must "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (citation and internal quotation marks omitted); *see also Mayo*, 566 U.S. at 73. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. . . . [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

### 2. Analysis

At step one of the *Alice* inquiry, Defendants allege that claims 25 to 27 of the '717 patent are directed to the abstract idea of remotely programming a device that can wirelessly transmit data. (D.I. 166 at 18) Defendants compare the challenged claims to the invalidated claims in *Chamberlain Group, Inc. v. Techtronic Industries Co.*, 935 F.3d 1341 (Fed. Cir. 2019), in which

16

the Federal Circuit held that claims directed to a garage door opener capable of communicating status information wirelessly amounted to an ineligible abstract idea.  (*Id.*; D.I. 187 at 12)

In response, Plaintiffs contend that the claims are not abstract because they are directed to improvements in machine-to-machine computer technology, such as securely storing outgoing telephone numbers or IP addresses based on the authentication of wireless transmissions and transforming the communication system to intelligently process data.  (D.I. 177 at 13-14) Plaintiffs further contend that remotely programming a device to wirelessly transmit data is not an abstract idea where, as here, the claimed programmable communicator device is a specific system designed to improve the functioning of machine-to-machine communications.  (*Id.* at 14-15)  Plaintiffs argue that claims 25 to 27 are unlike the claims at issue in *Chamberlain* because they are directed to more than transmitting content or communicating status information wirelessly rather than by wire.  (*Id.* at 16)

I recommend that the court deny Defendants' motion for summary judgment under § 101 because claims 25 to 27 of the '717 patent are not directed to an abstract idea.  Instead, the claims are directed to a concrete programmable communicator device having a processing module and an interface.  ('717 patent, col. 14:56-64)  These tangible components of the invention are configured in a specific manner to improve the functioning of the device, enabling the device "to use a memory to store at least one telephone number or IP address," "to use an identity module for storing a unique identifier," "to process data," and "to request that an at least one monitored technical device send data" through the claimed interface.  (*Id.*, cols. 14:56-15:39) The claimed elements allow the interface to be wirelessly reconfigured to establish communication links with particular monitored machine-to-machine devices.  (*Id.*; D.I. 178, Ex. 1 at ¶ 21)  The claims also recite a processing module that authenticates and securely programs

the telephone numbers or IP addresses in a transmission with a coded number.  (*Id.*; D.I. 178, Ex. 1 at ¶¶ 265-66)  Claims 25 to 27 recite more than wirelessly communicating status information, and Defendants' comparison of these claims to the garage door opener at issue in *Chamberlain Group, Inc. v. Techtronic Industries Co.* is therefore misplaced.[7]  (D.I. 166 at 18); *see Chamberlain*, 935 F.3d 1341, 1346 (Fed. Cir. 2019) (determining that claims reciting the wireless communication of status information about a movable barrier operator were directed to the abstract idea of communicating information wirelessly).

The specification of the '717 patent further highlights the extent to which the invention is directed to an apparatus capable of performing authenticated updates to a secure telephone book or IP address book using a unique code.  ('717 patent, cols. 9:35-10:37)  Instead of discussing remote programming in the abstract, the specification emphasizes the capabilities, functions, and enhanced security of the programmable communicator and the remote transmitting device.  (*Id.*)  When considered as a whole, claims 25 to 27 of the '717 patent recite improvements to machine-to-machine communication systems.

---

[7] Defendants also argue that claims 25 to 27 are not patent eligible because the PTAB confirmed that the concept of remotely programming a device to wirelessly transmit information was known in its final written decisions.  (D.I. 166 at 18)  But the PTAB made no determinations of patent eligibility under § 101 regarding the '717 patent.  (D.I. 167, Exs. B, C); *see Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019) ("Congress specifically limited the scope of *inter partes* review to a subset of grounds that can be raised under 35 U.S.C. §§ 102 & 103.").  "The standard for determining patent eligibility under § 101 is different from the standards for determining novelty under § 102 and obviousness under § 103." *Vaporstream, Inc. v. Snap Inc.*, 2020 WL 978731, at *7 (C.D. Cal. Feb. 28, 2020) (rejecting argument that the PTAB's decisions on obviousness in IPR proceedings were highly relevant to the § 101 determination of patent eligibility) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 91 (2012) ("declin[ing] the Government's invitation to substitute §§ 102, 103, and 112 inquiries for the better established inquiry under § 101.")).  Accordingly, the court cannot properly extend the PTAB's rulings invalidating claim 24 under § 103 to the instant § 101 analysis as suggested by Defendants.

Courts in this district have held that comparable claims providing a specific structure to solve a technological problem are not abstract.  For instance, in *Innovative Global Systems, LLC v. Keep Truckin, Inc.*, the court concluded that a claim directed to a physical onboard system that was specifically adapted to monitor and analyze data, generate a compliance status and signal for a driver based on hours of service, and transmit that data to a portable device was not an abstract idea.  *See Innovative Glob. Sys., LLC v. Keep Truckin, Inc.*, C.A. No. 19-1708-MN, 2020 WL 1443201, at *6 (D. Del. Mar. 24, 2020).  There, as here, claim limitations describing the functions of monitoring and transmitting data did not render the claim abstract because the focus of the claim was on the physical onboarding system using tangible components adapted to achieve those functions.  *Id.*

Similarly, the court in *RICPI Communications LLC v. JPS Interoperability Solutions, Inc.* held that a concrete system for two-way radio communication was not rendered abstract by a single claim element reciting a generic computer network or internet connection.  *RICPI Commc'ns LLC v. JPS Interoperability Sols., Inc.*, C.A. No. 18-1507-RGA, 2019 WL 1244077, at *4 (D. Del. Mar. 18, 2019).  The court in *RICPI* concluded that the functional claim language and conventional computer network did not render the patent ineligible because the claims were tied to specific machines, and the computer network replaced the telephone lines used in the prior art.  *Id.*  In accordance with *Innovative Global* and *RICPI*, claims 25 to 27 are not abstract because the focus of the claims is on a tangible device used to improve the underlying technology.  To reduce claims 25 to 27 to the abstract idea of remotely programming a device that can wirelessly transmit data would oversimplify the claims and ignore the express recitation of concrete elements in those claims.  *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837

F.3d 1299, 1313 (Fed. Cir. 2016); *see also Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1308 (Fed. Cir. 2020).

Defendants allege that claims 25 to 27 of the '717 patent are ineligible because they preempt the entire field of machine-to-machine communications.  (D.I. 166 at 20-21)  According to Defendants, the claims are broad enough to cover any device using a SIM card without providing any technological improvements.  (D.I. 187 at 12)  In response, Plaintiffs contend that there is no risk of preemption where, as here, the claims are drawn to a particular programmable communicator device.  (D.I. 177 at 18)

Claims 25 to 27 of the '717 patent do not preempt the entire field of machine-to-machine technology.  Instead, the claims are "limited to a specific arrangement of structures."  *See RICPI Commc'ns LLC v. JPS Interoperability Sols., Inc.*, C.A. No. 18-1507-RGA, 2019 WL 1244077, at *4 (D. Del. Mar. 18, 2019).  The claims are drawn to a specific programmable communicator device configured in a particular manner to send outgoing wireless transmissions, using a memory to store a telephone number or IP address included within a transmission if the processing module authenticates the transmission with a coded number.  ('717 patent, cols. 14:56-15:39)  This particular configuration does not preempt all forms of machine-to-machine transmission.  *See RICPI*, 2019 WL 1244077, at *4; *Innovative Global*, 2020 WL 1443201, at *6 (concluding that specific limitations recited in the claims "ground[ed] the invention more narrowly and avoid[ed] preemption.").

Because claims 25 to 27 of the '717 patent are not directed to an abstract idea, the court need not reach step 2 of the *Alice/Mayo* inquiry.  *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1108 (2020); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018).

### E.  No Infringement

#### 1.  Doctrine of equivalents

Defendants contend that summary judgment of no infringement under the doctrine of equivalents is warranted where, as here, Plaintiffs have failed to present any evidence or opinions to support a theory of infringement under the doctrine.  (D.I. 166 at 27)  Plaintiffs argue that summary judgment is inappropriate because expert discovery is ongoing and Defendants have not yet submitted their final expert report.  (D.I. 177 at 23)

I recommend that the court grant Defendants' motion for summary judgment of no infringement under the doctrine of equivalents because Plaintiffs waived the issue by citing no substantive support for their position.  Under the doctrine of equivalents, the court must assess "whether an asserted equivalent represents an 'insubstantial difference' from the claimed element, or 'whether the substitute element matches the function, way, and result of the claimed element.' "  *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)).  Here, Plaintiffs do not identify any evidence of record to support their theory of infringement under the doctrine of equivalents.  (D.I. 177 at 23)  When a plaintiff fails to raise a substantive doctrine of equivalents argument on summary judgment, the district court may properly find the issue has been waived.  *See ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 553-54 (Fed. Cir. 2018) (finding that "ViaTech failed to articulate a theory of infringement under the doctrine of equivalents to the district court, and the district court correctly found waiver of the issue.").

Plaintiffs' sole argument is that supplemental expert reports on noninfringement had not been served at the time their answering brief was filed.  (*Id.*)  The record reflects that both parties' experts have since supplemented their expert reports on infringement in accordance with

the court's June 23, 2020 order, and expert discovery on the issue is now complete.  (D.I. 172; D.I. 180; D.I. 186)  Nonetheless, Plaintiffs have not sought to supplement their summary judgment briefing to identify a genuine issue of material fact regarding their theory of infringement under the doctrine of equivalents.  Following the service of the supplemental expert reports, Plaintiffs submitted a sur-reply brief in opposition to Defendants' *Daubert* motion regarding Mr. Wacek's damages calculation.  (D.I. 195)  Plaintiffs' sur-reply brief does not include argument in support of the doctrine of equivalents theory of infringement.

### 2.  "Exclusive set of numbers" limitation[8]

Defendants next contend that summary judgment of noninfringement is warranted because the Accused Products do not satisfy the "exclusive set of numbers . . ." limitation of the '717 patent under the court's construction of the term.  (D.I. 166 at 27)  According to Defendants, the court's construction limits the claimed programmable communicator to sending outgoing wireless transmissions only to numbers on the exclusive list.  (*Id.* at 27-28)  Defendants allege that Plaintiffs improperly seek to expand this construction to encompass outgoing transmissions to numbers not included on the exclusive list.  (*Id.* at 27)  Defendants further argue that the undisputed evidence of record shows the Accused Products are capable of sending outgoing wireless transmissions to numbers that are not on the exclusive list.  (*Id.* at 28)

Plaintiffs allege that the claimed programmable communicator device may also send outgoing transmissions to numbers that have not undergone the claimed authentication process and are not stored in the claimed memory.  (D.I. 177 at 24)  Plaintiffs acknowledge that the

---

[8] The court recognizes that the phrase "exclusive set of numbers" is derived from the court's construction of a disputed claim term, and it does not reflect the language used in the Asserted Claims themselves.  (D.I. 148 at 3; D.I. 177 at 23 n.17)  The language used herein is intended to be consistent with the parties' briefing of the issue.

court's construction of the "exclusive set of numbers" refers to the set of numbers that have been authenticated and stored under the court's claim construction, but they argue that this term does not restrict outgoing transmissions that may occur without undergoing the authentication process, which fall outside the scope of the claims.  (*Id.*)  Moreover, Plaintiffs challenge the testing performed by Defendants' expert allegedly showing that the Accused Products are capable of sending outgoing wireless transmissions to numbers not on the exclusive number list.  (*Id.* at 25)

In its ruling on claim construction, the court construed the phrase "numbers to which the programmable communicator device is configured to and permitted to send outgoing wireless transmissions" as "the exclusive set of numbers to which the programmable communicator is limited to send any outgoing wireless transmissions."  (D.I. 140 at 13)  The court expressly rejected the notion that the term "only limits a 'particular type' of transmission but does not limit transmissions of a different type," concluding that the uses of the invention "do not suggest that broader communication options, let alone the ability to dial a number or connect to an IP address not already programmed into the device, are contemplated by the patent."  (*Id.* at 13-14) Accordingly, outgoing wireless transmissions are limited to being sent to numbers on the exclusive list, whether those wireless transmissions take the form of telephone calls or wireless data messages.  (*Id.*)  The court also recognized that the '717 patent does not address automatic system transmissions which occur without authentication, and "[t]he Court's construction therefore does not limit automatic system transmissions."  (D.I. 140 at 14-15)

I recommend that the court grant Defendants' motion for summary judgment of non-infringement based on the "exclusive set of numbers" limitation.  Defendants' expert, Dr. Kevin Negus, performed testing of the Group 1 and Group 2 Accused Products that purportedly revealed they were capable of sending outgoing wireless transmissions, which were not

automatic system transmissions, to numbers not on the exclusive list in the FDN phonebook. (D.I. 167, Ex. O at ¶¶ 60-99)  Plaintiff's expert, Mr. Geier, challenges the methodology used by Dr. Negus in performing this testing,[9] but he confirms Dr. Negus' conclusion that the Group 1 and Group 2 Accused Products "may allow outgoing data transmissions to addresses that have not been stored in the secure phonebook."  (D.I. 178, Ex. 3 at ¶¶ 22-41, 137)  Mr. Geier does not suggest that these unauthenticated outgoing wireless transmissions are automatic system transmissions.  Mr. Geier similarly represents that the GX450 product "may be capable of contacting other URL or IP addresses, or sending SMS messages or making calls to other [unauthenticated] telephone numbers."  (D.I. 178, Ex. 3 at ¶ 44)

Although Mr. Geier characterizes these undisputed fact as "irrelevant," the court's Memorandum Opinion on claim construction makes clear that outgoing data transmissions are only permitted to authenticated numbers in the secure phonebook.  (D.I. 178, Ex. 3 at ¶ 137; D.I. 140 at 13-14) (concluding that the uses of the invention "do not suggest that broader communication options, let alone the ability to dial a number or connect to an IP address not already programmed into the device, are contemplated by the patent.").  Plaintiffs do not identify any disputed issue of fact suggesting that the Accused Products satisfy this limitation as defined by the court.  Therefore, summary judgment is warranted.

---

[9] Plaintiffs do not seek to exclude the testimony of Dr. Negus or otherwise challenge his expert opinions under an application of the *Daubert* standard.  Therefore, Plaintiffs' contentions are relevant only to the weight the jury may give to Dr. Negus' opinions.  *See Affymetrix, Inc. v. Illumina, Inc.*, C.A. No. 04-901-JJF, 2007 WL 6505208, at *1 (D. Del. Mar. 1, 2007).

### 3. Non-SIM products

#### a. Direct infringement

Defendants argue that the accused non-SIM embedded module products do not infringe

claims 25 to 27 of the '717 patent because it is undisputed that these products are not sold with

SIM cards, and they cannot meet the "processing module" and "configured to use a memory"

limitations without the use of a SIM card. (D.I. 166 at 30-31)  Because the non-SIM products

must be altered by adding the SIM card before they are capable of infringement, Defendants

allege that the non-SIM embedded module products cannot literally infringe the '717 patent as

sold. (*Id.* at 32; D.I. 187 at 16)

In response, Plaintiffs contend that the Accused Products possess the claimed capabilities

of the "processing module" and "configured to use a memory" limitations as they are sold by

Defendants. (D.I. 177 at 27)  Plaintiffs explain that, because the claims are apparatus claims,

they are infringed when the accused device is capable of performing the claimed functionality

even if it cannot actually perform the recited functions. (*Id.*)  Plaintiffs challenge Defendants'

assertion that inserting a SIM card into the Accused Products modifies or alters the device,

arguing that Defendants blur the distinction between modifying and activating the device's

functionality. (*Id.* at 29)

I recommend that the court deny Defendants' motion for summary judgment of non-

infringement with respect to the accused non-SIM products.  The asserted claims require a

"processing module for authenticating one or more wireless transmissions" and a "programmable

communicator device [that] is configured to use a memory." ('717 patent, col. 14:60-66)  These

apparatus claims use functional language, and an accused product may be found to infringe if it

has the capability of performing the recited function. *See Finjan, Inc. v. Secure Computing*

*Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010) (concluding that the plaintiff's "non-method claims describe capabilities without requiring that any software components be 'active' or 'enabled.'"); (D.I. 187 at 16) ("Defendants do not argue that the claims are method claims.").

In this regard, the court's decision in *M2M Solutions LLC v. Motorola Solutions, Inc.* is instructive. There, the court was confronted with similar issues of device activation versus modification in the context of a non-infringement argument regarding the parent of the '717 patent, U.S. Patent No. 8,094,010 ("the '010 patent"). *M2M Sols. LLC v. Motorola Sols., Inc.*, C.A. No. 12-33-RGA, 2016 WL 70814, at *8-9 (D. Del. Jan. 6, 2016). In support of their motion for summary judgment of non-infringement, the defendants argued that the devices, as sold, must be modified with AT Commands before possessing the capability of operating in the two accused modes. *Id.* The plaintiff responded that the accused firmware contained software program code rendering the device capable of performing the recited functions without modifying the underlying code. *Id.* The court evaluated the testimony of the plaintiff's expert, who opined that the accused products were capable of performing the claimed functionalities, such as performing coded number authentication and using a permitted callers list, without requiring a customer to modify the products. *Id.* at *9. Specifically, the plaintiff's expert explained that AT Commands from the user merely activated this already-existing functionality. *Id.* In denying the defendants' motion for summary judgment of non-infringement, the court concluded that a jury crediting the testimony of Plaintiff's expert could find that AT Commands simply activated the pre-existing code in the accused modules, thereby supporting a verdict of infringement. *Id.*

Similarly, there is evidence in this case to support Plaintiffs' position that the insertion of a SIM card into the claimed apparatus serves to activate the existing functionality of the device, akin to pressing an "ON" button. The focus of the parties' dispute is whether the accused non-

SIM products are capable of performing the recited functions as sold, or whether the insertion of a SIM card into the accused non-SIM products amounts to a modification of the product that precludes a finding of infringement. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011). Plaintiffs' expert, James Geier, raises genuine issues of material fact suggesting that the accused non-SIM products are capable of performing the functions in the claim limitations without modifying the firmware already present in those products. For example, Mr. Geier explains that the "configured to use a memory" limitation is satisfied by the Group 1 AR7552 product, which is capable of executing commands to write a phonebook entry to the FDN phonebook on a SIM card:

> If an FDN-enabled SIM card is inserted into the Group 1 Accused Products, the "AT+CPBS" and "AT+CPBW" could be used to select and write a telephone number to the FDN phonebook. Thus, the Group 1 Accused Products are configured to use a memory to store at least one telephone number.

(D.I. 178, Ex. 3 at ¶ 122) The same applies to the Group 2 SL8080 product. (*Id.* at ¶ 127)

Mr. Geier confirms that the non-SIM products are designed to operate with SIM cards in this manner, and no new functionality is required to utilize the SIM card: "The Accused Products have a SIM interface for connecting to and controlling a Subscriber Identity Module ('SIM card')." (D.I. 178, Ex. 3 at ¶ 103) In this regard, Mr. Geier suggests that "inserting a SIM card with certain features into the Accused Products . . . is akin to pressing the 'ON' button on a phone, in the sense that a patent claim directed to a phone with an 'ON' button is infringed when a phone with an 'ON' button is made, not when a user later presses the 'ON' button." (D.I. 167, Ex. G at ¶ 106) Accordingly, a reasonable jury could conclude that the accused functionality is "already present" in the accused non-SIM products, and no modification is required to achieve that functionality. *See M2M*, 2016 WL 70814, at *8 (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010)).

### b.   Induced infringement

Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "[T]o prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal quotation marks omitted). In other words, "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc).

Defendants first allege that Plaintiffs have failed to show evidence of induced infringement because the record does not support a finding of direct infringement. (D.I. 166 at 32) According to Defendants, the SIM cards inserted into the claimed programmable communicator device must have FDN functionality, which is an optional feature in the relevant wireless standards. (*Id.*) But Defendants argue that the record contains no evidence showing that the FDN feature was supported by U.S. wireless carriers, or that any of Defendants' customers bought a SIM card with the FDN functionality. (*Id.* at 32-33)

Plaintiffs reject Defendants' assertion that there must be evidence of a customer actually inserting an FDN-enabled SIM card into the products to establish direct infringement, noting that the claims only require "a programmable communicator device [that] is configured to use a memory," as opposed to requiring the memory itself. (D.I. 177 at 30) Plaintiffs argue that the cause of action for induced infringement is supported by the record because the Accused

Products include firmware to support the FDN phonebook that requires a SIM card, and Defendants encouraged their customers to use the Accused Products with a SIM card.  (*Id.* at 31)

The court's decision in *M2M* is again instructive.  There, as here, the defendants argued that there could be no direct infringement because there was no record evidence of any third party having operated the accused devices in an infringing manner.  *M2M Sols.*, 2016 WL 70814, at *12.  The court rejected the defendants' argument, explaining that it ignored the functional capability required by the claims and "recycle[d] their contention that the accused modules require modification before they are even capable of infringing."  *Id.*  Similarly, claims 25 to 27 of the '717 patent claim a device configured to use a memory, but they do not claim the memory itself.  ('717 patent, cols. 14:56-15:39)  Instead, the claims are written in functional terms.  As a result, the Accused Products may be capable of infringing as they are sold because they include firmware to support an FDN phonebook requiring a SIM card.[10]  *See M2M Sols.*, 2016 WL 70814, at *12.  Components which may be required to activate that functionality are not claimed.

The record before the court also contains evidence supporting Plaintiffs' position that Defendants took steps to induce their customers to infringe.  Mr. Geier cites evidence showing that Defendants encouraged customers to use the Accused Products with a SIM card in an

---

[10] Defendants further allege that the Accused Products require a specific m2m/IoT SIM card with FDN functionality to infringe the '717 patent, but the accused embedded SIM card products do not possess these features, and there is no evidence showing that customers bought m2m/IoT SIM cards with FDN functionality for use in the Accused Products.  (D.I. 166 at 33)  This argument again ignores Plaintiffs' position that the Accused Products, as sold, possess the functional capabilities to satisfy the limitations of claims 25-27.  Regardless, a disputed issue of fact exists regarding whether a specific m2m/IoT SIM card with FDN functionality must be used with the Accused Products.  Plaintiffs' expert, Mr. Geier, suggests that testing performed by Dr. Negus was flawed because he used SIM cards commonly used in consumer applications, as opposed to IoT/m2m applications.  (D.I. 178, Ex. 3 at ¶¶ 27-29)  Mr. Geier's position that certain SIM cards are better suited for IoT/m2m applications does not amount to an undisputed requirement that a specific IoT/m2m SIM card with FDN functionality must be used.

infringing manner by providing them with manuals to "obtain access to the FDN phonebook on the SIM card, and to select a phonebook on the SIM card." (D.I. 178, Ex. 2 at ¶ 392) With respect to the server.url and sms.fallback feature, the evidence shows that Defendants instruct and encourage customers to download the ReadyAgent software to the Accused Products. (*Id.*, Ex. 2 at ¶ 394; Ex. 12 at SWAI0016210) This evidence is sufficient to raise an issue of fact. *See M2M Sols.*, 2016 WL 70814, at *12-13 (denying summary judgment of no induced infringement where the defendants sold the accused modules to customers with instructions to connect an antenna to the modules).

For these reasons, I recommend that the court deny Defendants' motion for summary judgment of no induced infringement.

### c.   Contributory infringement

In accordance with 35 U.S.C. § 271(c), the "distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005). Thus, contributory infringement is established "where an article is good for nothing else but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe." *Id.* (citations and internal quotation marks omitted).

Defendants seek summary judgment of no contributory infringement because they argue that the Accused Products are capable of a substantial non-infringing use, namely, the use of a SIM card without FDN functionality or use without ReadyAgent. (D.I. 166 at 34) In response, Plaintiffs allege that the court need not reach the question of contributory infringement because the Accused Products directly infringe the '717 patent's functional claim limitations. (D.I. 177 at 32) Plaintiffs point to Mr. Geier's opinion that the Accused Products cannot be used over a

wireless network without a SIM card, and they argue that Defendants contributed to infringement by providing Accused Products capable of having ReadyAgent functionality downloaded and installed.  (*Id.*)

In *M2M Solutions*, the court rejected a nearly identical argument raised by the defendants that the accused modules had substantial non-infringing uses because they could operate in non-infringing modes.  *M2M Sols.*, 2016 WL 70814, at \*13.  The court rejected the defendants' arguments, noting that the claims recite functional capability and do not "require[ ] that the accused devices actually be operated in the infringing modes."  *Id.*  It was undisputed that the accused products had to be connected to an antenna for use, and the plaintiff's expert opined that the accused products satisfied "the full functional capability to meet the claim limitations" once the accused products were connected to an antenna.  *Id.* at \*14.  Citing *Finjan* for the proposition that a device claiming functional capability "may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation," the court determined that "a reasonable jury could conclude that the accused products have no use if they are not connected to an antenna."  *Id.* (quoting *Finjan*, 626 F.3d at 1204).

Here, the record shows that the Accused Products are not capable of being used over a wireless network without a SIM card, and Mr. Geier opines that Defendants "contributed to infringement by providing the Accused Products that include a SIM interface and are designed to be used with a SIM card."  (D.I. 178, Ex. 2 at ¶ 396)  With respect to the ReadyAgent feature, Mr. Geier states that Defendants contributed to infringement "by providing Group 2 Accused Products that are capable of having this functionality downloaded and installed on the module interface and are designed to be intelligent modules."  (*Id.*, Ex. 2 at ¶ 398)  Where, as here, a

31

reasonable jury could conclude that the Accused Products infringe once a SIM card is inserted or ReadyAgent is installed, summary judgment is not warranted. *See M2M Sols.*, 2016 WL 70814, at *14. Therefore, I recommend that the court deny Defendants' motion for summary judgment of no contributory infringement.

### 4. AR7552 product

According to Defendants, summary judgment of non-infringement with respect to the accused AR7552 product is warranted because Plaintiffs have not demonstrated that the embedded SIM card includes the infringing FDN functionality, and the SIM card added after purchase does not render the product infringing for the same reasons stated with respect to the non-SIM products. (D.I. 166 at 34) In response, Plaintiffs contend that the AR7552 product infringes because claims 25 to 27 of the '717 patent do not require a SIM card, but instead claim a device configured to work with a SIM card. (D.I. 177 at 32)

As previously discussed, claims 25 to 27 only recite functional capability. Mr. Geier has opined that the AR7552 product satisfies the "processing module" and "configured to use a memory" elements by having a SIM card interface capable of interacting with a SIM card. (D.I. 178, Ex. 2 at ¶¶ 100-10) Consequently, summary judgment of non-infringement by the accused AR7552 product is not warranted.

### 5. Preamble

Finally, Defendants contend that summary judgment of non-infringement is warranted because the Accused Products do not infringe the "programmable communicator" limitation in the preamble of the Asserted Claims. (D.I. 166 at 35) Defendants note that the Accused Products are not sold with a power supply or an antenna, cellular service is not activated when the Accused Products are sold, and the non-SIM products are sold without a SIM card. (*Id.*)

According to Defendants, the Accused Products are not communicators until a customer inserts a SIM card, activates cellular service, attaches an antenna, and powers the Accused Products. (*Id.*)

In response, Plaintiffs allege that the Asserted Claims do not require a power supply, an antenna, activated cellular service, or a SIM card. (D.I. 177 at 33) In support, Plaintiffs cite the court's claim construction ruling, which rejected Defendants' proposed construction of the preamble as requiring "a complete wireless circuit that transmits and receives data and includes an antenna." (*Id.*) (citing D.I. 140 at 4-5)

I recommend that the court deny Defendants' motion for summary judgment of non-infringement based on the "programmable communicator" limitation in the preamble. The evidence of record establishes that Defendants described the Accused Products as programmable communicators in their own literature. (D.I. 178, Ex. 2 at ¶¶ 87-88, 187-88, 307-16)

## IV.   *DAUBERT* MOTIONS

Federal Rule of Evidence 702, which governs the requirements for expert witness testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court described the role of a trial judge under Rule 702 as "a gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Rule 702 embodies a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520

F.3d 237, 243 (3d Cir. 2008).  Motions to exclude evidence are committed to the Court's

discretion.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).

The Third Circuit has summarized the three requirements under Rule 702 as follows: "(1)

the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about

matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony

must assist the trier of fact."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

Under the second factor, expert testimony is admissible only if "the testimony is based on

sufficient facts or data," "the testimony is the product of reliable principles and methods," and

"the expert has reliably applied the principles and methods to the facts of the case."  Fed. R.

Evid. 702(b)-(d).  As to the third factor, the expert testimony must "fit" under the facts of the

case such that the expert testimony "will aid the jury in resolving a factual dispute."  *Meadows v.

Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009).

## A.  Mr. Wacek's testimony

Defendants challenge the admissibility of testimony by Plaintiffs' damages expert, Mr.

Joel Wacek.  (D.I. 166 at 36-39)  In his expert report, Mr. Wacek calculates a reasonable royalty

based on a hypothetical negotiation between a willing licensor and a willing licensee just before

infringement of the '717 patent began.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301,

1324 (Fed. Cir. 2009) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116,

1120 (S.D.N.Y. 1970)).  For the following reasons, I recommend that the court deny Defendants'

*Daubert* motion to exclude Mr. Wacek's testimony.

### 1.  Novatel Agreement

Defendants argue that Mr. Wacek's methodology is not reliable because he based his

damages opinion in large part on a settlement agreement between Blackbird Tech LLC, M2M

Solutions LLC, and Enfora, Inc., Novatel Wireless Solutions, Inc., and Inseego Corp. (the "Novatel Agreement"), in which the parties settled purportedly comparable litigation for a lump sum of ████. (D.I. 166 at 37)  According to Defendants, the Novatel Agreement is not sufficiently comparable because it encompasses ████████████████ ████████████. (D.I. 166 at 37 & n.17)  But the Novatel Agreement was executed to settle a case alleging only one count of infringement of the '717 patent, and its terms reflect that ████████████████████████████ ████. (D.I. 178, Ex. 16 at 16; C.A. No. 14-1101-RGA, D.I. 1 at ¶¶ 12-20)  That the Novatel Agreement also covered ████████████████████ ████████████████████ ████████████████████ ████████████ does not alter the fact that the underlying litigation also involved the '717 patent.  (D.I. 167, Ex. S at BBT002938)

Defendants next contend that the Novatel Agreement is not a reliable basis for calculating a reasonable royalty rate because it was executed on August 24, 2018, almost four years after the 2014 date of the hypothetical negotiation between the parties in this case.  (D.I. 166 at 37-38)  In response, Plaintiffs argue that consideration of such license agreements is appropriate under the "book of wisdom" doctrine, and the underlying sales data in the Novatel Agreement began in February 2014, when the '717 patent issued and the hypothetical negotiation would have occurred.  (D.I. 177 at 36)

Mr. Wacek provides sufficient evidence to show that his comparison is reliable, and Defendants' arguments go to the weight and credibility of his opinion, as opposed to its admissibility.  The law is well-established that an expert may rely on evidence post-dating the

time of the hypothetical negotiation. *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005) ("If the hypothetical negotiation could not be informed by post-negotiation information, then prospective infringers might perceive that blatant, blind appropriation of inventions . . . is the profitable, can't-lose course."). Here, Mr. Wacek accounts for the difference in timing between the February 2014 date of the hypothetical negotiation and the August 24, 2018 execution of the Novatel Agreement by evaluating and comparing sales beginning in February 2014 that formed the basis of the Novatel Agreement. (D.I. 178, Ex. 16 at 18 n.88; Exs. F, F-2)  The exhibits to Mr. Wacek's report summarize "Novatel's licensed sales of accused products and Sierra's estimated accused sales through the expiration of the '717 Patent for purposes of calculating the implied lump sum royalty from the Novatel Settlement Agreement." (D.I. 178, Ex. 16 at 18 n.88)  Defendants' argument goes to the weight and credibility to be given Mr. Wacek's opinion, which is more appropriately addressed on cross-examination. *See Lectec Corp. v. Chattem, Inc.*, 2011 WL 13085199, at *2 (E.D. Tex. Feb. 1, 2011) (determining that criticism of expert's use of after-arising evidence went to the weight, not the admissibility, of the opinion); *see also Bio-Rad Labs., Inc. v. 10x Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 4691047, at *3 (D. Del. Sept. 28, 2018) ("[T]he 'degree of comparability . . . as well as any failure on the part of [the expert] to control for certain variables are factual issues best addressed by cross examination and not by exclusion.'" (quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d, 1312, 1333 (Fed. Cir. 2012)).

Defendants also challenge Mr. Wacek's reliance on the Novatel Agreement because Blackbird, as opposed to M2M, executed the Novatel Agreement, and Blackbird is not the proper party to the hypothetical negotiation. (D.I. 166 at 38)  But the Novatel Agreement expressly

36

identifies M2M as a party to the Novatel Agreement, and M2M is a signatory of the Novatel

Agreement.  (D.I. 167, Ex. S at BBT002937; BBT002948)

      Next, Defendants cite the disclaimer in ███████ of the Novatel Agreement, which

states that ████████████████████████████████████████████████

█████████████████████████████ as support for their position that the Novatel

Agreement cannot reliably support a reasonable royalty calculation in this litigation.  (D.I. 166 at

38)  According to Plaintiffs, however, Mr. Wacek considered this language in combination with

other facts surrounding the Novatel Agreement and this litigation, and reliance on the Novatel

Agreement in this context is not improper.  (D.I. 177 at 37)

      Although "[c]ourts are generally skeptical of allowing settlement agreements to prove a

reasonable royalty," a settlement agreement may properly be considered by a damages expert "in

its proper context within the hypothetical negotiation framework to ensure that the reasonable

royalty reflects the economic demand for the claimed technology."  *TC Tech. LLC v. Sprint

Corp.*, C.A. No. 16-153-RGA, 2019 WL 2515779, at *14 (D. Del. June 18, 2019) (internal

quotation marks and citations omitted).  Here, the record shows that Mr. Wacek expressly

considered the disclaimer in ███████ of the Novatel Agreement, as well as "the available facts

and circumstances of the underlying litigation and settlement agreement to evaluate the extent to

which any specific litigation-related factors unduly influenced the royalty amount that Inseego

agreed to pay, and that Blackbird agreed to accept."  (D.I. 178, Ex. 16 at 16-17)  Mr. Wacek

proceeded to discuss at length the circumstances in the underlying litigation culminating in the

Novatel Agreement, and he acknowledged that those circumstances "differ from those that

would be present at the hypothetical negotiation, where infringement and validity of the '717

Patent would be known."  (*Id.* at 17)  Nonetheless, he concluded that the information did not

support a conclusion that "the terms of the Novatel Settlement Agreement were unduly affected by the 'coercive' effects of litigation.  Rather, the ████ payment was negotiated considering the extent and scope of Novatel's alleged infringement of the '717 Patent."  (*Id.*)  Challenges to Mr. Wacek's reasoning on this point go to the weight of the testimony, not the admissibility.  *See Bio-Rad Labs., Inc. v. 10x Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020) ("[T]he issue of comparability is often one of sufficiency of the evidence, not admissibility.").

Finally, Defendants challenge Mr. Wacek's alleged failure to consider sales of Novatel products through the first quarter of 2017, despite continued sales of products relevant to the damages calculation.  (D.I. 166 at 38)  According to Plaintiffs, however, Mr. Wacek's alleged failure to consider sales of Novatel products after the first quarter of 2017 goes to the weight of his testimony, not its admissibility, and Defendants have failed to explain how Mr. Wacek's reliance on the testimony of Blackbird's 30(b)(6) witness was improper.  (D.I. 177 at 37)  The court agrees that Mr. Wacek's consideration of Novatel product sales through the first quarter of 2017 goes to the weight, and not the admissibility, of his testimony.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 855-56 (Fed. Cir. 2010) (""The existence of other facts . . . does not mean that the facts used fail[] to meet the minimum standards of relevance or reliability. . . . [I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.").

### 2.  Soracom benchmark product

Next, Defendants challenge as methodologically unsound Mr. Wacek's reliance on a third-party product offering, identified as the Soracom benchmark product, which has no known relationship to the '717 patent or the 2014 hypothetical negotiation.  (D.I. 166 at 39)  In response, Plaintiffs contend that a royalty can be reliably determined by valuing the infringing

features based on comparable features in the marketplace. (D.I. 177 at 39)  As a result, Plaintiffs argue that Mr. Wacek appropriately relied on technical opinions establishing that Soracom provides comparable functionality to the infringing features of the Accused Products. (*Id.*)

The methodology used by Mr. Wacek in evaluating the Soracom benchmark product is sufficiently reliable to satisfy the admissibility standard. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("A party may . . . value the infringed features based upon comparable features in the marketplace. . . .").  Mr. Wacek relies on Mr. Geier's technical opinions to establish that the Soracom benchmark product has comparable functionality to the infringing features of the accused AirVantage software system because it "provides remote device management of a programmable device" such as the Accused Products. (D.I. 178, Ex. 16 at 29)  Mr. Wacek also evaluated Soracom's public product information to determine that the Soracom benchmark product uses the same protocol to support remote management of devices that may also be used in the Accused Products. (*Id.*)  Moreover, Mr. Wacek reviewed public pricing information from Soracom to determine that the upfront $1.00 per device cost "is indicative of the market pricing of benchmark products that provide similar functionalities as those described" by the '717 patent. (*Id.*)  These factual allegations are sufficient to establish the comparability of the allegedly infringing features in the Accused Products and the Soracom benchmark product, and testing the merits of the comparison is more appropriately addressed through cross-examination and the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596.

Defendants also argue that reliance on the Soracom benchmark product is not methodologically sound because there were ██████ ██ the Soracom benchmark product in the ████████ . (D.I. 187 at 20)  But Plaintiffs allege that the present record leaves open the

39

possibility that another Soracom entity sold the benchmark product in the United States prior to April 30, 2020.  (D.I. 195 at 2)  Even if the Soracom benchmark product ████████████ ████████, Plaintiffs contend that the pricing of the product is still relevant to the economic contribution of the patented technologies to the Accused Product where, as here, Defendants have not demonstrated ██████████████████████████████ ████████ in which the Soracom benchmark product ████ ███.  (*Id.* at 3)

A factual disagreement exists between the parties regarding whether the Soracom ██████████████████████████████.  Defendants point to the Soracom Global Affidavit in its entirety for the proposition that no such sales exist.  (D.I. 187 at 20)  But Mr. Wacek concluded the Soracom Global Affidavit does not support Defendants' position because it leaves open the possibility that ██████████████████████████████ ████████████ (D.I. 196, Ex. 18 at 2-3)  This issue goes to the weight of Mr. Wacek's opinion, as opposed to its admissibility.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  Moreover, Defendants have proffered no authority suggesting that evidence of foreign sales cannot be informative.  *Cf. Plastic Omnium Advanced Innovation & Research v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 411–12 (D. Del. 2018) (declining to exclude expert testimony relying on a foreign patent license).  For these reasons, I recommend that the court deny Defendants' *Daubert* motion to exclude Mr. Wacek's damages opinions.

### B.  Mr. Geier's claim construction

For the reasons previously stated at § III.E.2, *supra*, I recommend that the court grant Defendants' motion to exclude Mr. Geier's opinions regarding the "exclusive set of numbers"

limitation.  *See Personalized User Model, L.L.P. v. Google, Inc.*, C.A. No. 09-525-LPS, 2014 WL 807736, at *1 (D. Del. Feb. 27, 2014) ("Expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the trier of fact," and should be excluded under *Daubert*).

## V.   CONCLUSION

For the foregoing reasons, I recommend that the court GRANT Defendants' motion for summary judgment of non-infringement with respect to the doctrine of equivalents and the "exclusive set of numbers" limitation.  I recommend that the court DENY Defendants' motion in all other respects.  (D.I. 165)  I recommend that the court DENY Defendants' *Daubert* motion regarding Mr. Wacek's Testimony.  Finally, I recommend that the court GRANT Defendants' *Daubert* motion regarding Mr. Geier's opinion on the "exclusive set of numbers" limitation.

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties.  In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **December 18, 2020**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure."  *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)).  If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.  *See Sincavage v. Barnhart,* 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: December 4, 2020

Sherry R. Fallon
United States Magistrate Judge